**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No.    1:21-cr-115 (CRC)** |
| | ) | |
| **EDUARDO NICOLAS** | ) | |
| **ALVEAR GONZALEZ** | ) | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR RELEASE FROM CUSTODY**

The United States respectfully files this memorandum in support of its oral motion that the defendant, Eduardo Nicolas Alvear Gonzalez, be detained pending trial pursuant to 18 U.S.C. § 3142(f)(2)(A) and (B). Gonzalez has been charged with, inter alia, unlawfully entering the United States Capitol building as part of a riotous mob of hundreds.  What's more, he later hid from law enforcement with the individual he now offers as a potential third-party custodian, and they flaunted that fact on the internet.  Gonzalez's statements and actions all demonstrate that there are no conditions of release that would reasonably assure the safety of the community or Gonzalez's compliance with Court orders.

I.    **Factual Background**

A.  **The Attack at the U.S. Capitol on January 6, 2021**

On January 6, 2021, thousands of rioters stormed the U.S. Capitol Building. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate chamber.

A large crowd began to gather outside the Capitol perimeter as the Joint Session got underway. Crowd members eventually forced their way through, up, and over Capitol Police barricades and advanced to the building's exterior façade. Capitol Police officers attempted to maintain order and stop the crowd from entering the Capitol building, to which the doors and windows were locked or otherwise secured. Nonetheless, shortly after 2:00 p.m., crowd members forced entry into the Capitol building by breaking windows, ramming open doors, and assaulting Capitol Police officers. Other crowd members encouraged and otherwise assisted the forced entry. The crowd was not lawfully authorized to enter or remain inside the Capitol, and no crowd member submitted to security screenings or weapons checks by Capitol Police or other security officials.

Shortly thereafter, at approximately 2:20 p.m., members of the House and Senate (including Vice President Pence)—who had withdrawn to separate chambers to resolve an objection—were evacuated from their respective chambers. The Joint Session and the entire official proceeding of the Congress was halted while Capitol Police and other law-enforcement officers worked to restore order and clear the Capitol of the unlawful occupants.

Later that night, law enforcement regained control of the Capitol. At approximately 8:00 p.m., the Joint Session reconvened, presided over by Vice President Pence, who had remained hidden within the Capitol building throughout these events.

In the course of these events, approximately 81 members of the Capitol Police and 58 members of the Metropolitan Police Department were assaulted, and one Capitol Police officer died. Additionally, four citizens died; many media members were assaulted and had cameras and other news-gathering equipment destroyed; and the Capitol suffered millions of dollars in damage—including broken windows and doors, graffiti, and residue of various pepper sprays, tear gas, and fire extinguishers deployed both by crowd members who stormed the Capitol and by Capitol Police officers trying to restore order.

### B. Eduardo Nicolas Alvear Gonzalez Unlawfully Enters the Capitol Building with "Patriots" and Smokes in the Rotunda

Gonzalez was one of those hundreds of individuals that forcibly stormed the Capitol grounds and unlawfully entered the Capitol building.  While doing so, he photographed and filmed most of his actions and collected much of those materials in a folder on his laptop entitled, Captiol [sic] Storming."  On January 7, 2021, Gonzalez narrated a livestream video to his online followers, showing many of his photographs and videos and describing everything he did that day.

Gonzalez, for example, shows and narrates a video he recorded on January 6, in which he approaches the Capitol from the West side and breaks in with other rioters.  He explains his impression that "cops were like 'fuck, man, we shouldn't have backed up,'" and then appears to sarcastically say, "oh but they let us in, right?"  When his video he is narrating shows him break into the Capitol, he says "we're taking our country back."  Then, Gonzalez continues narrating one of his videos showing him unlawfully march into the Capitol with numerous other rioters past law enforcement officers.  He explains that the mob told the officers "they were doing the right thing"

by standing down, because they were outnumbered by the rioters.  The video then pans to four law enforcement officers near the throngs of rioters, and Gonzalez narrates "yeah, you think they're going to actually try to like … shit … they were probably told 'stand down, do not fuck with them, you guys will get hurt.'"

In his January 7, 2021, livestream, Gonzalez then shows a portion of his January 6 recordings where he continues to march through the Capitol, and he sarcastically says, "yeah, this is the most protected building," and laughs.  He then narrates that he and other rioters were looking for "doors to break in" as they walked around the Capitol.  Gonzalez then plays a clip from his recordings where he pans the camera to himself in the Capitol Rotunda and yells, "time to smoke weed in here!"  Afterward, Gonzalez narrates that at this point he asked someone to film him smoking in the Capitol, and the video shows Gonzalez hand the camera to another rioter who records Gonzalez light a pipe and begin smoking.  A screen shot of the video is below.



Gonzalez then restates to his live viewers "I'm showing everyone how I barged into the Capitol yesterday."  Soon afterward, he notes there are "200 plus" people in an open chat room of

individuals that appear to be watching his live stream video.  He explains to everyone watching that he and other rioters were "the first wave that got in on top."  Later, while narrating the video, Gonzalez says "never back down," while showing other rioters storm around the Capitol Rotunda with him.

Eventually, Gonzalez describes how he smoked more "joints" in the Capitol Rotunda after smoking from the pipe.  Specifically, he explains that he smoked three "joints" at the Trump rally and then discovered that he had an additional eight "joints" that "were already rolled" on his person while at the Capitol Rotunda.  He then says he smoked a joint and handed out others to fellow rioters throughout the Capitol Rotunda.  To highlight this fact, Gonzalez shows a video of the Capitol Rotunda that appears to be hazy and says, "here it is, me blazing up at the Capitol.  Mary jane."  When an individual walked up to him and asked why Gonzalez was smoking weed in the Capitol, Gonzalez responded, "freedom."

Near the end of his livestream video on January 7, 2021, Gonzalez shows another video he filmed outside the Capitol showing a crowd of rioters in what appears to be a standoff with law enforcement, and he states "these are all American patriots."

### C.  Eduardo Nicolas Alvear Gonzalez Goes Into Hiding

Gonzalez resided in the Los Angeles, California area before January 6, 2021.  He flew from California across the country to the Washington, D.C. area in advance of the scheduled rallies related to the 2020 Presidential Election.  During the month of January 2021, records illustrate that he stayed in an Airbnb in Alexandria, Virginia, for a term of 30 days.  Travel records reveal that Gonzalez was scheduled to fly back to Los Angeles, California, on February 1, 2021.  During the weekend of January 30, 2021, however, Gonzalez cancelled his trip.  On or around that same week,

widely-publicized news articles had described how law enforcement identified and arrested another Capitol riots defendant at the airport as he waited to board his flight.[1]

Pursuant to legal process, the government attempted to discover Gonzalez's location using phone-location data. Gonzalez, however, had apparently ceased paying for the account and allowed it to shut off. He has no fixed address on the East Coast, and only later did law enforcement learn that Gonzalez had traveled to Virginia Beach, Virginia, where he met with a friend—J.M.—who he has now proposed to be a third-party custodian for his release. While there, Gonzalez proceeded to livestream videos every night to hundreds of followers, during which he would smoke what he referred to as weed, discuss various conspiracy theories related to distrust of the government, and actively try to conceal his friend's identity and their whereabouts.

Specifically, on numerous occasions Gonzalez and J.M. bragged about and described smoking marijuana while livestreaming from J.M.'s apartment, which is illegal. And, while doing so, he espouses a number of conspiracy theories. These theories range from talking about "adrenochrome" and elites in America who harvest the drug from the glands of children while abusing them, to all of humanity living in a simulation, to references to other related "Q-Anon" conspiracies.

In one video, Gonzalez and J.M. appear and begin smoking marijuana while they talk to each other and to their viewers. Gonzalez consistently refers to J.M. as "Million," rather than use his real name. Minutes into the video, Gonzalez apparently realizes that J.M. is wearing a shirt that appears to have the name of his workplace on the front. Gonzalez says something to J.M., who begins to walk off screen and out of the room. At that time, Gonzalez says that J.M. is going to change his shirt and adds that he had to "protect the homie."

---

[1] *See* https://www.cnn.com/2021/01/25/politics/capitol-hill-rioter-kicked-off-plane-trnd/index.html (Last accessed on March 11, 2021).

In part using the background of Gonzalez's livestreamed videos, law enforcement learned of Gonzalez's whereabouts in Washington, D.C.  Eventually, law enforcement performed a ruse to better learn of Gonzalez's presence in the specific apartment unit.  On February 8, 2021, law enforcement sent a uniformed officer to the apartment unit to report that a 911 hang-up call had been traced back to that area, and so the officer was checking at apartments to make sure everyone was safe.  When the officer knocked on J.M.'s apartment door, the officer heard whispering inside. J.M. then answered the door, and the officer asked if J.M. was the only person there.  J.M. responds that he is the only person in the apartment.

That night, on February 8, 2021, Gonzalez livestreamed another video and has another individual "join" him on video while streaming from another location.  At one point, Gonzalez and the other individual engage in the following exchange:

| | |
|---|---|
| Gonzalez: | "Fucking cop comes over this morning, like you see why I fucking hid in the closet praying to God… it was so scary bro … you know I do have an escape route by the way.  I have a lit one … there's a there's a lioness who lives here, up the street … |
| Other Individual: | You've got a bolthole. |
| Gonzalez: | I've got a bolthole, dude, that's tight. |
| Other Individual: | What it means is somewhere to dash to … |
| Gonzalez: | Exactly.  It's like bugging out, bug out. |
| Other Individual: | Always good to have a plan B |
| Gonzalez: | Yeah. Yeah.  It's Always good and I'm so happy that she reached out and said that cuz now I feel a little like, whew, I could actually probably do something in case that were real. … Well hey we're here now and we're alive and safe, I think the whole riot is gonna be safe, like, we'll be good. Absolutely….I'm out of weed. |

Law enforcement arrested Gonzalez on February 9, 2021.

II.   **Procedural Background**

The Criminal Information charged Gonzalez with entering a restricted building without lawful authority, in violation of 18 U.S.C. § 1752(a); and; violent entry on Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2).  Gonzalez made his initial appearance in the Eastern District of Virginia on February 9, 2021, and the government moved for detention.  After a detention hearing, a United States Magistrate Judge in the Eastern District of Virginia detained Gonzalez pending trial, pursuant to 18 U.S.C. § 3142(f)(2), concluding that he is a risk of flight and danger to the community.  *See* Attachment 1, Detention Hearing Transcript.  The Magistrate Judge then ordered that Gonzalez be transported to Washington, D.C. for further proceedings.

## ARGUMENT

The government submits that it has met its burden of persuasion that pretrial detention is warranted.  The Court must consider four factors in making this determination: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).  A judicial officer's finding of dangerousness must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(b); *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988).  When "risk of flight" is the basis for detention, however, the government must only satisfy a preponderance of the evidence standard.  *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).  An analysis of these four factors weighs in favor of Gonzalez's continued detention given the preponderance of evidence that he poses a serious risk of flight as well as the clear and convincing evidence that his release presents a particular danger to the community.

## I.      The Nature and Circumstance of the Offense

January 6, 2021, was a day hundreds of rioters breached the U.S. Capitol, millions of dollars of damage was done to our seat of government, the certification of a presidential election was delayed, and people lost their lives.  Gonzalez traveled nearly 3,000 miles and was part of that mob of rioters and their destruction, but to him, these rioters were "Patriots."  Far from someone who got caught in the moment, Gonzalez helped create the moment by joining the unlawful activity and having the mindset to take out his camera and record and narrate his actions and those of others.  And the magnitude of that moment only galvanized him as he posted photographs and videos of other rioters and bragged that they were all storming the Capitol grounds.  Even after a day of time to reflect on his actions and the mayhem that he and others caused, Gonzalez described with pride his and other's motivation: "We're taking our country back."  The defendant's deeply-held beliefs motivated him to travel across the country and to later halt an election he felt was stealing his country.  In the process he ripped at the fabric of our democratic society.

What's more, Gonzalez saw the criminal conduct around him and treated it as just another occasion to light and smoke marijuana.  He, in fact, explains on video later that he distributed marijuana to other rioters so they could join him in illegal conduct while unlawfully obstructing the Congressional proceeding by unlawfully breaking into the Capitol building.  If the defendant's flippant treatment of his criminal conduct and the government house of democracy is any indication of how he will treat the Court's conditions, the government submits there is little room for confidence the defendant will respect the rule of law when it comes to any restrictions on his freedom.

## II.    The Weight of Evidence Against Gonzalez is Strong

The weight of the evidence against Gonzalez is immense: U.S. Capitol surveillance cameras that capture Gonzalez at the Capitol; videos of Gonzalez's first-person view of his rush on the Capitol; and a number of videos Gonzalez later livestreamed and uploaded to the internet with his face and name as he narrated his videos, photographs, and actions on January 6, 2021. Put simply, the defendant's inability to hide from the weight of this evidence creates the acute risk that he will attempt to hide from this Court.

## III.    History and Characteristics of Gonzalez

The defendant openly smokes what he says is marijuana both while committing federal offenses (i.e., breaking into the Capitol building), and while livestreaming videos online to encourage others to join him.  And he was willing to distribute marijuana while at the Capitol to help other rioters while they wreaked havoc on the Congressional proceeding and building.

There is also a substantial question as to whether the defendant will respect or adhere to any restrictions that the Court may impose on him.  The defendant's marijuana-soaked social media activity in the week prior to his arrest indicates that he is simply not grounded in reality, much less in the niceties of our legal system.  For example, he touched on beliefs that Hollywood elites are harvesting chemicals from children they abuse, and that he is living in a simulation.  This goes far beyond any opinions he may hold regarding the outcome of an election, and it undermines the ability of the Court to impose meaningful restrictions on his conduct in the real world.

The government acknowledges that the defendant has limited criminal history, but in weighing the remaining factors set forth under the Bail Reform Act, this fact alone does not significantly diminish his danger or flight risk.

**IV.     Danger to the Community and Risk of Flight Posed by Gonzalez's Release**

It is difficult to fathom a more serious existential danger to the community—to the District of Columbia, to the country, or to the fabric of American Democracy—than the one posed by someone who joined other insurrectionists in occupying the United States Capitol.  Every person who was present without authority in the Capitol on January 6 contributed to the chaos of that day and the danger posed to law enforcement, the United States Vice President, Members of Congress, and the peaceful transfer of power.  Make no mistake: the fear the defendant helped spread on January 6 persists—as seen even as recently as March 4, 2020, when the House of Representatives postponed various hearings in light of continuing threats to the safety of the Capitol and the lawmakers.

As for the defendant's risk of flight, Gonzalez has made it clear to the Court that he is capable and willing to hide.  He has no fixed address on the East Coast, canceled his long-scheduled flight plans back to California after January 6, 2021, ceased payments on his phone plan and allowed it to deactivate, and stayed with a friend, J.M., in Virginia Beach.  While with that friend, he filmed a number of videos and never referred to J.M. by name—only referring to him as "Million."  And if Million accidentally did something that could give away any details of where Gonzalez was—like where a shirt affiliated with his company of employment—Gonzalez made sure to warn him.

Most importantly, Gonzalez has offered J.M. as a potential third-party custodian—the same J.M. who was willing to lie to law enforcement on Gonzalez's behalf on February 8, 2021.  On the day before Gonzalez's arrest, a uniformed officer explicitly asked J.M. if he was the only one home, despite that officer hearing whispering in J.M.'s apartment after he knocked.  And J.M. lied to the officer's face, saying he was the only one there.  All while Gonzalez, according to his own

words, hid inside a closet.  And Gonzalez knew exactly why police may be looking for him.  As he explained in an online video that same evening, he believed after he made his narrow escape that "the whole riot is gonna be safe, like, we'll be good."  He was one of the rioters, and he thought he'd be safe from arrest by hiding.  Indeed, Gonzalez went so far as to create a contingency escape plan, which he described in an online video: "I do have an escape route by the way….there's a [person] who lives here," someone he agreed gave him a place "to dash to."  The defendant was willing to run and hide after storming the Capitol on January 6, 2021, and there is no reason to believe he will not do so again given the chance.

No combination of conditions could reasonably assure the safety of the community and Gonzalez's compliance with Court orders.  Only detention mitigates such grave risks.

### **CONCLUSION**

For the foregoing reasons, the government thus requests that the Court grant the government's motion and detain Eduardo Nicolas Alvear Gonzalez pending trial.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

By:  _____
TROY A. EDWARDS, JR.
Assistant United States Attorney
N.Y. Bar No. 5453741
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530
Email: troy.edwards@usdoj.gov
Phone: 202-252-7081

Dated:        March 11, 2021

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 11, 2021, I sent a copy of the foregoing to the Court's

electronic filing system.

_____
TROY A. EDWARDS, JR.
Assistant United States Attorney