```
1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2                    Norfolk Division

3

4    - - - - - - - - - - - - - - - - - -
                                       )
5    UNITED STATES OF AMERICA,         )
                                       )
6    v.                                )   CRIMINAL ACTION NO.
                                       )   2:21mj48
7    EDUARDO NICOLAS ALVEAR            )
     GONZALEZ,                         )
8                                      )
             Defendant.               )
9    - - - - - - - - - - - - - - - - - -

10

11

12                TRANSCRIPT OF ZOOM PROCEEDINGS

13                    Norfolk, Virginia

14                    February 12, 2021

15

16   BEFORE:  THE HONORABLE LAWRENCE R. LEONARD
             United States Magistrate Judge

17

18   APPEARANCES:

19

20            UNITED STATES ATTORNEY'S OFFICE
              By:  Andrew Bosse
21                 Assistant United States Attorney
                   Counsel for the United States

22            FEDERAL PUBLIC DEFENDER'S OFFICE
              By:  Rodolfo Cejas
23                 Assistant Federal Public Defender
                   Counsel for the Defendant

24

25
```

1        (Hearing commenced at 2:12 p.m.)

2              *     *     *     *     *

3        (Recording begins at 2:21 p.m.)

4        MR. BOSSE:  ...and from there he's been continuing

5   to broadcast his conspiracy theory videos and live streams

6   to his network of followers.  In one of the live streams,

7   Gonzalez notes that the other man in the apartment, JM, is

8   going to change his shirt, the shirt which had the name of

9   his company on it, and Gonzalez says that he's doing this to

10  protect the home.

11        There is no information the government has that he

12  intends to return to California or has a fixed address

13  there.  The two more recent addresses on file for him are

14  connected to his estranged wife.

15        I want to talk about what happened earlier this

16  week on February 8th as law enforcement is narrowing down

17  where he is and is trying to find out if he is still at the

18  apartment on Laskin.  They use a ruse to try to determine

19  that.  They had an officer from the Virginia Beach Police

20  Department in uniform knock on the apartment door.  The ruse

21  was that there had been a 911 hang-up call traced back to

22  that area and so an officer was checking the apartments to

23  make sure everything was okay.

24        The officer knocks on the door of the apartment and

25  hears whispering.  The door is then answered by the person

1      associated with the apartment, JM.  The officer asks JM if

2      he is the only person there.  JM says he's the only person

3      there, meaning that he lies to the officer to help his

4      friend, the defendant, hide.

5              This same person, JM, appears on several of the

6      defendant's YouTube live streams, which appear to be

7      broadcast from that apartment, and in several of them, he

8      appears to be smoking marijuana with the defendant.  That

9      same night, this Monday night, Mr. Gonzalez is again live

10     streaming to his fellow conspiracy theorists, and he's

11     speaking in one portion of a live stream video to a man with

12     a foreign accent.

13             Part of the title of this video references "smoking

14     in the Capitol."  He called the video, "Smoking with

15     brotunda."  Here is what Gonzalez says.  He says -- and I'm

16     going to use profanity, but I think it's necessary --

17     "Fucking cop comes over this morning.  Like, you see why I

18     fucking hid in the closet praying to God.  It was so scary,

19     bro.  You know I do have an escape route, by the way.  I

20     have a lick one.  There is a lioness," and that's the term

21     he uses for one of his female followers.  "There is a

22     lioness who lives here up the street."  The other man on the

23     videos talks about, "Oh, you've got a bolt hole," and later

24     explains a "bolt hole" means somewhere to dash to.  And

25     Gonzalez says, "I've got a bolt hole, dude.  That's right.

1    It's like bugging out, bug out."  The other man says, "It's
2    always good to have a plan B."  And Gonzalez says, "Yeah.
3    Yeah, it's always good, and I'm so happy that she reached
4    out and said that because now I feel a little like, fwew, I
5    could actually probably do something in case that were
6    real."  And he then says, "We are here now.  We are alive
7    and safe.  I think the whole riot is going to be safe, like,
8    we'll be good, absolutely."  And then he says, "I'm out of
9    weed."

10        I want to talk a little bit about the live streams.
11   Actually, I can skip this part.  I've mentioned that some of
12   them show him using drugs.  He's open about using/smoking
13   marijuana on these live streams from here in Virginia, which
14   is illegal, and he's proud of what he did.  One of the live
15   streams he sets as his background a photograph of the
16   Capitol building.

17        Getting back to this week, on Tuesday, the 9th, FBI
18   and others executed a search warrant at the residence where
19   he's staying.  In addition to the electronic devices they
20   are looking for, they find a rifle that's claimed by JM, was
21   not seized.  They also found marijuana and a number of
22   steroids, of Anabolic steroids, two vials of a substance
23   called Gonadotropin, a vial of a substance called
24   Trenbolone, a vial of a substance called SP Super Trim, and
25   multiple other vials.

1        There are other pills that are found there that are

2  often used in conjunction with taking steroids, like blood

3  pressure medication, pills to stop estrogen production.  The

4  defendant didn't affirmatively state that the drugs were

5  his, but he said he understood that he could potentially be

6  charged for them.  And that's the point, Your Honor, which

7  he is arrested on the warrant from the District of Columbia.

8        I'll say that the defendant was cooperative with

9  the FBI at the arrest.  He spoke to them after being read

10  the *Miranda* warnings, and he admitted that that was, in

11  fact, him inside the Capitol.  He said he was a documentary

12  filmmaker and was trying to live stream from inside the

13  Capitol.  Claims he didn't realize it was wrong to invade

14  the Capitol during this riot.

15        He explained that he went up and down some

16  hallways, and then at one point said that he asked a police

17  officer how to get out.  He said he did not want to go back

18  to L.A. because of this whole thing going on, referencing

19  the Capitol events, we believe, but said he liked this area

20  and that the man JM had offered to let him stay here.

21        At his post-arrest interview, the defendant

22  admitted that he believed in some conspiracy theories but

23  denied that he was closely affiliated with the conspiracy

24  theory known as QAnon.  A lot of that is inaccurate, which

25  I'm going to get to, and it's important.  The defendant is

1   not just a dabbler in conspiracy theories, including QAnon.

2   He seems to be a true believer and promotes these baseless

3   theories to what was at one time a significant online

4   audience that he claims a good number in the tens of

5   thousands.

6           Also, the idea that he just stumbled into the

7   Capitol, if that's the argument, is incorrect for the

8   reasons I've narrated above.  His own video evidence shows

9   that that is not the case.  Also, he saved photos and

10  footage in a computer folder called "Capitol storming."  He

11  talks about how he barged into the Capitol.  While narrating

12  that, he says, "Never back down."

13          On his Twitter feed we have postings like, "Revolt,

14  revolt, revolt," and "Civil War time," and, "It's about time

15  for a revolution."  And these are from the Twitter postings

16  associated with, "A Good Lion Entertainment" or "A Good Lion

17  Media," which is his, quote, unquote, production company.

18          THE DEFENDANT:  False.

19          MR. BOSSE:  And I see the defendant is nodding his

20  head no, and I'm happy to have him explain that, but I'm

21  going to continue on.

22          There is another post on this Twitter statement

23  that says, "We charged the Capitol to make a statement.  We

24  own the Government.  Our forces will be needed again out

25  there."

1          THE DEFENDANT:  Is needed.

2          THE COURT:  Let me interrupt you for a second,

3     Mr. Bosse, and direct these comments to Mr. Gonzalez.

4          Mr. Gonzalez, you have an attorney here who will

5     speak for you, and when it's his time to talk, he'll do so.

6     If you wish at any point to meet privately in a breakout

7     room with your lawyer, when there's an appropriate time to

8     do so, you can do that, but please do not interject in this

9     proceeding.

10          THE DEFENDANT:  Sorry, Your Honor.

11          THE COURT:  All right.  Go ahead, Mr. Bosse.

12          MR. BOSSE:  Thank you, Your Honor.  There is a

13     Twitter statement that says, "We charged the Capitol to make

14     a statement.  We own the government," and then says, "Our

15     forces will be needed again out there," is a statement that

16     he was supporting patriots by taking the Capitol and smoking

17     people out, referring to giving them marijuana.

18          There's a posting which he appears to be responding

19     to something that lawyer Rudy Giuliani said where the

20     defendant says, "And next time we will go harder, stronger

21     " -- sorry, "We will go stronger, harder, and we will break

22     more shit."

23          There is talk about the glory of this uprising and

24     references to his involvement in a siege.  There are

25     re-tweets of a statement about reported election fraud that

1   says, "Maximum penalties are now on the table."  And there's

2   posted video of him just feet away, again, from the

3   frontline as the crowd starts to breach the police line.

4           There is a video inside the Rotunda.  "I and

5   thousands of others literally just stormed the Capitol.  You

6   bet I smoked maga out up in there, five joints lit up at

7   once."  And there are also re-tweets of QAnon conspiracy

8   content.

9           I want to talk a little bit about these conspiracy

10  theories because in my view they're directly relevant to his

11  motivation here and to whether he poses a risk of flight and

12  is a danger to the community.

13          The QAnon belief system, if you can call it that,

14  involves a conspiracy of government and Hollywood elites

15  who, in the views of the people who hold this, are running

16  some sort of underground child sex trafficking ring and are

17  harvesting a substance called Adrenochrome, I guess

18  supposedly from the glands of the children.

19          And the defendant's videos show that he is very

20  much into this nonsense.  He's made purported documentaries

21  about people in the entertainment entry, which he calls

22  Pervywood, and talks about the substance Adrenochrome,

23  claims celebrities are using the substance Adrenochrome.

24          In addition to the conspiracy theories -- by the

25  way, on the videos he also talks about driving drunk and

1   getting into a near fatal accident.  And he's open about

2   what seem to be pretty regular drug usage, which he

3   broadcasts.  He also talks about being fired from the job he

4   had in information technology.

5          And I've spent now a couple of hours of my life

6   this week, that I will never get back, listening to the

7   defendant talk about his various beliefs.  There is a belief

8   that we may be living in a simulation.  There is talk that

9   we are living on a flat Earth, or what the defendant calls a

10  dome firmaments, and that the Smithsonian Institution is

11  hiding evidence of giants.

12         He is interested in Hollywood and media celebrities

13  being involved in some kind of satanic child sex trafficking

14  cult that includes the purported harvesting of this

15  substance, and he talks about elites sacrificing children

16  and drinking their blood.  Talks about drugging children,

17  filming abuse, and killing children.

18         According to this conspiracy fantasy, it's so

19  bizarre, it is almost impossible to believe that people

20  believe it, but apparently he does.  And there is also

21  mentions of the number 17, which, and I'm a novice, but I

22  understand that is a code for Q, related to QAnon.

23         Your Honor, that's the substance of my proffer, and

24  I'll reserve argument.  Thank you.

25         THE COURT:  All right.  Thank you, Mr. Bosse.

1       Mr. Cejas.

2       MR. CEJAS:  I'm sorry.  My apologies.  Thank you,

3 Your Honor.  I would note -- I'll respond to the

4 government's proffer during argument.  However, what I would

5 note, as far as Mr. Alvear Gonzalez is concerned, he's 32

6 years old.  He's lived most of his life in California.  I

7 would just reiterate the information contained in the

8 pretrial services report.

9       He has no prior criminal history whatsoever, no

10 instances where he has been charged with any sort of crime

11 and did not appear.  He has been in this area for a brief

12 period of time.  I would note that I've spoken to the

13 individual known as JM.  That person is willing -- he is

14 willing to serve as a third-party custodian, willing to

15 remove the firearm from his residence.

16       However, understanding that the -- anticipating

17 that the government would make the argument that it did or

18 concerning JM, we've also -- I've also spoken to Mr. Alvear

19 Gonzalez's wife, Erica.  She is willing for him to live

20 there with herself and her -- their, I believe, 4-year-old

21 daughter, Luna, who is also there.

22       THE COURT:  Where, Mr. Cejas?

23       MR. CEJAS:  I'm sorry.  This is in California,

24 Judge.  This is in California.  And she does not have any

25 firearms at her address.  She has no prior criminal history

1    whatsoever.  She did not attend anything in Washington, D.C.

2    on January 6th, and as far as I know, she's not affiliated

3    with any of the other matters that the government has

4    brought up.

5           I would also note, and maybe I can reserve this for

6    argument, but in the videos that we are aware of, there is

7    nothing showing that Mr. Gonzalez was engaged in any acts of

8    violence.  There is nothing to show that -- other than maybe

9    statements he made -- that he was one of the ones on the

10   front lines.  He may have been behind them, certainly not

11   ones breaking through the windows.

12          In the many videos that I'm sure all of us have

13   seen in the past four days, there is nothing there to

14   suggest, nothing, and I reviewed quite a number of those

15   from the impeachment trial, Mr. Gonzalez is not in those

16   videos, and those videos are, obviously, the very worst.  He

17   would be easy to spot because, as is indicated in the

18   affidavit, I believe, he was wearing flag pants.

19          So there is no one identified with flag pants

20   engaged in the kinds of activities that we saw in those

21   videos this week.  The other thing I would note is that in

22   reviewing the evidence, the United States D.C. office chose

23   to charge him with misdemeanors, which means that that was

24   the most severe conduct that he engaged in.  He is not

25   charged with a felony here.  They certainly had time to

1  charge him, indict him, and they chose to charge him with,

2  well, misdemeanors, two of which are class B misdemeanors.

3          So I will reserve the rest for argument, Your

4  Honor.

5          THE COURT:  All right.  Thank you, Mr. Cejas.

6          MR. CEJAS:  Thank you.

7          THE COURT:  Mr. Cejas, before I get to the

8  argument, I would like to know the proposed, either JM in

9  Virginia Beach as a third-party custodian, or the

10 defendant's ex-wife who you said lives in California.

11         MR. CEJAS:  That's correct.

12         THE COURT:  Any more specific about that?  What

13 city in California does she live in?

14         MR. CEJAS:  Your Honor, I'm sorry.  She is in

15 Ventura, California, I believe, and I have an address which

16 I could provide to the Court at the appropriate time.

17         THE COURT:  All right.  Do you know how long she's

18 resided there?

19         MR. CEJAS:  She has been there, I believe, for --

20 they were there together for approximately five years.  She

21 has been at that address, I believe, four years.

22         THE COURT:  All right.  Thank you, Mr. Cejas.

23         MR. CEJAS:  Thank you.

24         THE COURT:  All right.  Mr. Bosse.

25         MR. BOSSE:  Thank you, Your Honor.  Your Honor,

1    I'll note, with respect to Mr. Cejas's statement, is true

2    about the current charges.  I'll say that the U.S.

3    Attorney's office is still investigating and is considering

4    a felony charge under 1512, but because it's not lodged yet,

5    and at this point would be speculative, I'm not hanging my

6    argument on that.  My argument is that while the defendant

7    is currently facing misdemeanor charges, the nature and

8    circumstances of this offense are exceptionally great.

9           The defendant was driven by bizarre conspiracy

10   theories, that he not only holds, that broadcasts to many

11   others to join a mob that stormed and invaded the United

12   States Capitol and temporarily disrupted the certification

13   of our election results.  He joined an insurrection against

14   the government that was intended to impede the peaceful

15   transition of power.

16          He did not just end up in the wrong place at the

17   wrong time.  His own videos, postings, and comments make

18   that abundantly clear.  He's near the front lines as a

19   violent mob assaults and breaks through a police line

20   protecting the Capitol.

21          He is then rushing into the Capitol with a mob, and

22   later, as he's narrating it to his followers, he calls it

23   taking our country back, talking about people looking for

24   doors to break in, and then he's using drugs inside the

25   Capitol rotunda and passing them out to others.  And then

1   we've got the statements that he makes on Twitter, "Revolts,

2   Civil War, we own the government, our forces will be needed

3   again out there," and talking about the glory of this

4   uprising, which he's proud of.

5          Your Honor, in one of the videos that he posts that

6   he took inside the Rotunda, what he says is, "I and

7   thousands of others literally just stormed the Capitol."  It

8   couldn't be more clear the seriousness of what he did, and

9   the weight of the evidence is overwhelmingly strong.  He

10  posted videos of himself committing the crimes.  He bragged

11  about it while broadcasting them later, which raises one of

12  many concerns here, and that is the absolute impunity that

13  he acted with and continued to act with after the fact.

14         The defendant, based on his belief and these

15  bizarre conspiracies, thinks that he did nothing wrong by

16  joining an insurrection against the government of the United

17  States, and, in fact, is celebrating that.  And then to put

18  the last nail in, he admits that it was him to the FBI,

19  which while doing a search warrant, they find the electronic

20  devices they are looking for, and they also find marijuana

21  and what appear to be a number of different kinds of

22  Anabolic steroids.

23         Looking to the history and characteristics of the

24  defendant, I'm looking at the 3142(g)(3)(A) factors, and

25  with the exception of criminal history and record of

1    appearance of prior court proceedings, the defendant does

2    not have a criminal history.  Every single one of these

3    factors weighs greatly against him.  Physical condition

4    seems fine.  As to his mental condition, he's perfectly

5    competent and lucid, but the belief structure that he has

6    embraced makes him both dangerous and a risk of flight.

7    He's fallen under the sway of a web of conspiracy theories

8    that is not just bizarre but dangerous.

9           If you believe that so-called elites, government

10   elites, Hollywood celebrities, et cetera, are members of

11   some kind of satanic cult, sex trafficking children on a

12   massive scale, harvesting some substance from them,

13   sacrificing them, drinking their blood, this is sheer

14   wild-eyed nonsense.

15          But if you believe that, what wouldn't you do?  The

16   defendant was not just there sitting in his basement

17   absorbing this material.  He is acting on it, amplifying it

18   and re-broadcasting it.  And what does he do with it?  One

19   thing he might do with that set of beliefs is take part in

20   an insurrection that you believe is going to stop these

21   people and storm the Capitol building, which he did.

22          Another thing he might do is make threatening

23   statements about what's going to happen next time, which he

24   did.  Another thing that he might not have the greatest

25   respect for is the authority of a court of the United States

1   and its requirement that you appear there to face the

2   consequences of your crimes.

3         We have already seen, because he has shown us and

4   gloated about it, what this defendant thinks of the

5   authority of the United States government.  He didn't just

6   call for a revolution, he tried to help start it himself.

7   Why in the world should we think he will appear to face the

8   consequences of his actions, whether he's here or in D.C. or

9   all the way across the country in Ventura, California, even

10  further from the Court that has jurisdiction over his case.

11  And that's before, Your Honor, we get to the specific

12  evidence of his intent with respect to flight.  He cancels

13  his flight back to California, surely, knowing from the

14  news, that other insurrectionists are being detained at the

15  airport.  He appears to have cut off his phone, and he's

16  hiding out in Virginia Beach.  And I'm not surmising when I

17  say hiding out.  He knows that what he did is illegal, and

18  he suspects the police are looking for him.  When an officer

19  comes to the door, he hides in the closet while his

20  roommate, JM, who is harboring him there, tells a bald face

21  lie to a uniform police officer to continue hiding him.

22        Then on a broadcast to his followers the same

23  night, he talks about having a, quote, escape route, one of

24  his female followers that he believes he could escape to

25  also in the local area and says, "I'm so happy that she

1   reached out because now I can actually probably do

2   something."

3          We don't have to guess what he's going to do when

4   he's out of custody, Your Honor.  He's already told us.

5   Looking at the other factors, family ties, none.  He's

6   estranged from his parents and siblings.  Until right this

7   moment, my understanding was that he was estranged from his

8   ex-wife.  I have no idea what that situation or that

9   scenario is like or whether it would be a safe place for

10  him, for his ex-wife, for his daughter, or for the people of

11  Ventura, California.

12         Employment, none that we are aware of other than

13  making and posting wild conspiracy theory documentaries.  He

14  was apparently fired from the last job he held.  Financial

15  resources, he's been appointed counsel, and so if he was

16  honest on that form, they're not great.  The length of

17  residence in the community appears to be a few weeks,

18  staying with a person who has shown by his actions and

19  statement that he's absolutely unfit to be any kind of

20  third-party custodian.

21         The defendant appears to have two community ties

22  here, one of whom was actively harboring him, hiding him

23  from the police and lying to protect him, and the other who

24  is supposedly his escape route.  His past conduct, I won't

25  reiterate, is outlined in what I said before.  History

1     relating to drug abuse appears extensive, and he is wide

2     open about it.  The only point in his favor is a lack of a

3     criminal record, but he's been open about committing crimes;

4     drug use, drunk driving, and taking part in an insurrection

5     against this government.

6          Almost every factor points heavily against him.

7     The defendant wants to evade, capture -- wanted to evade

8     capture.  Now that he's been captured, if he's set free,

9     there is no reason to think that he is not going to go

10    underground and try to do the same thing again.  There is

11    nothing that the Court could put in place that's going to

12    stop him from fleeing and from failing to appear.  He's

13    already indicated that he's trying to avoid the consequences

14    of his actions, and now he's facing jail time.  And for the

15    same reasons, Your Honor, he is a danger to the community.

16    He acted with impunity, and he's proud of what he did, and

17    his motivations are passing bizarre.

18         He's absolutely a danger to any community that he's

19    in, and even if the Court disagreed that we've made the

20    necessary showing on that, the government's position is the

21    evidence is as clear as can be that he's a flight risk

22    because he said that he's a flight risk, and given what we

23    know about him, there is no set of conditions that are going

24    to contain that risk.

25         Your Honor, thank you for allowing me to make a

1   longer proffer and argument than is typical.  That's all I

2   have.

3           THE COURT:  All right.  Thank you, Mr. Bosse.

4           All right.  Mr. Cejas, I'll hear your argument.

5           MR. CEJAS:  Thank you, Your Honor.  Your Honor, I

6   think -- and I'll address the two issues, danger to the

7   community and then risk of flight.  As far as danger to the

8   community is concerned, essentially we have a one-time

9   event, and certainly the events of January 6th at the

10  Capitol are unprecedented, so I'm not going to try to

11  minimize those in any case.  I think what's important,

12  however, is that the agency, the United States, which viewed

13  his activities, which had his videos, whose had everything

14  there, chose to charge him with a misdemeanor.

15          In looking at the guidelines just briefly, he would

16  be facing a range around zero to six months.  As I said

17  before, in many of the disturbing videos that we saw, he --

18  and I'm referring to during the impeachment trial and the

19  other videos Mr. Bosse references, there is nothing showing

20  that he is engaged in acts of violence.  There is nothing

21  showing that he was engaged in threatening behavior.

22          Is the evidence strong?  Yes.  I'm not going to

23  suggest otherwise, considering it's all on video.  But

24  certainly not danger to the community as I believe that is

25  anticipated by Congress and by the President in enacting

1    this section of the Bail Reform Act.

2         The government makes much of the conspiracy

3    theories.  Certainly, conspiracy theories, they are

4    concerning, but the fact that someone believes something is

5    not a crime.  The fact that they tout them is not a crime.

6    It doesn't show that they are a greater danger necessarily.

7         Many of the things -- and I took a look at the

8    website, Good Lion website, there are some interesting

9    videos there.  Much of what Mr. Bosse said in his argument,

10   particularly that we are going to take our country back, is

11   a quote from the President right before the rally occurred.

12   You know, we are going to raise hell, we are going to do all

13   of these things, is a quote from the President right before

14   these things occurred.  Any information, statements

15   regarding the Beach State, regarding many of the conspiracy

16   theories that Mr. Bosse references, have been quoted

17   repeatedly by the former President of the United States.

18        So I would suggest that if they are not -- they do

19   not necessarily suggest that that individual is dangerous,

20   and certainly that's arguable, but be that as it may, there

21   is nothing to suggest that they pose a danger or make

22   Mr. Alvear Gonzalez more dangerous in any way.

23        Unfortunately, if people want to believe that the

24   earth is flat, that's not a crime.  There are some people

25   who don't believe that anyone went to the moon.  That's not

1   a crime.  There are people who believe -- I've got clients
2   who tell me that the sun goes into the water, that's why it
3   turns orange.  That's not a crime.  It may be strange; it
4   may be a variety of things.  It's not a crime.
5           As far as risk of flight is concerned, I think the
6   Court can establish conditions or a combination of
7   conditions to ensure his appearance in court.  One, the
8   Court can require that he stay with his wife.  Two, the
9   Court can require electronic monitoring.  I'm certain that
10  Mr. Alvear Gonzalez has never been in jail before.
11  Certainly, he would understand that if he were -- if he were
12  to fail to appear in court, he would face a potential
13  penalty significantly greater than what he may face now.
14          I think it's important to note that although the
15  police did a knock and talk the day before, it was a ruse.
16  They did not tell the individual there that they were
17  looking for Mr. Alvear Gonzalez in any case.  Even in the
18  video that he created the next day, there is no indication
19  that he ever attempted to flee.  He did not go anywhere, and
20  then when the FBI showed up, it's my understanding that he
21  was extremely cooperative.  He gave them -- I believe they
22  had a password for his phone.  They secured his phone.  No,
23  they had a search warrant for his phone.  He provided the
24  password, he provided the external hard drive, and he gave
25  statements thereafter.

1          Whether or not he believed it was a crime or not,

2    again, people can believe what they want.  That doesn't

3    matter as far as it relates to risk of flight or danger to

4    the community.  I believe that the Court can establish

5    conditions or a combination of conditions.  I confess that

6    perhaps Mr. JM is not the best candidate given the

7    circumstances.  Although I did speak to him, he is willing

8    to turn Mr. Alvear Gonzalez's passport over to pretrial

9    services.  He's willing to remove any firearms from the

10   home, if the Court did consider him.  But, in any case, even

11   if the Court permitted him to go back and to stay with his

12   wife, the passport can be turned in here.

13         So I understand that these events of January 6 were

14   unprecedented.  I understand the concerns about the

15   conspiracy theories.  I would suggest that some of those are

16   protected by the First Amendment in this fight.  The nature

17   of them, I do not believe that they, in and of themselves,

18   create a danger to the community.  I would even note that we

19   have a congresswoman who was elected as a member of The

20   QAnon crew, so, from Georgia, again, most recently.

21         So it may not be whatever, but it's not evidence

22   that he will not show up in court when he is required to.

23   Thank you.

24              THE COURT:  All right.  Thank you, Mr. Cejas.

25              The Court evaluates every case when the government

1  moves for detention independently and individually, and the

2  principle behind that is never more apparent than in the

3  case brought before the Court today.

4         The defendant has been charged with two Class A

5  misdemeanors and two Class B misdemeanors.  Those offenses

6  should not be minimized because of the nature of the charge

7  brought.  In other words, just because they are Class A or

8  Class B misdemeanors does not mean that the nature and

9  circumstances of the offense can't be extraordinarily

10  serious.

11         The Court's not going to weigh in on evaluating the

12  momentousness of the January 6th attack on the Capitol.

13  That's for others to decide.  But the Court has to take that

14  into consideration in determining whether there are

15  conditions or a combination of conditions that can be

16  fashioned that would assure this defendant's appearance in

17  court and to protect any other person in the community.

18         The nature and circumstances of these offenses are

19  extraordinarily serious.  The weight of the evidence appears

20  to be substantially strong in no small part by the

21  defendant's own doing by virtue of his social media

22  outreach, his live streaming, his recording for posterity

23  the events in which he engaged.

24         With respect to the defendant's personal history

25  and characteristics, the defendant has no criminal history.

1   He has no ties, though, to this community or to the District

2   of Columbia where his case is pending.  His physical

3   condition appears to be fine.  His mental condition appears

4   to be healthy, albeit apparently affected in some respects

5   by a series of rather strange beliefs.  But as Mr. Cejas

6   points out, believing in strange things is not a crime.

7           There is a First Amendment right to believe what

8   one wants to believe, and ordinarily that doesn't come into

9   play in determining whether or not someone poses a risk of

10  flight or a danger to the community unless those beliefs

11  turn to actions, and the actions here, as been emphasized by

12  the government, include a very blatant storming of the

13  Capitol and deliberate and expressed intentions to evade

14  accountability for that, to evade capture, to seek an escape

15  route.

16          Brazen doesn't begin to describe the notion of

17  announcing over the Internet not only what you've done on

18  January the 6th but what you call for to happen afterwards

19  and how you plan to escape and to evade law enforcement and

20  responsibility.

21          The last factor is the nature of the risk posed to

22  the community by the defendant's release, and the Court is

23  not weighing whether or not someone who believes in QAnon

24  poses a risk of danger to the community just based on those

25  beliefs.  The question for the Court is whether or not those

1    beliefs may tend to lead to action, action that could cause

2    a risk of harm to the community.

3         According to the government, the defendant has

4    expressed numerous intentions to advocate for a violent

5    revolution.  I don't know that there is any other way to

6    describe that.  And so when I look at the conditions that

7    are available to the Court, electronic monitoring involves

8    an ankle bracelet.  It's been the Court's experience in the

9    past that those can be cut off.

10        The Court has to weigh not whether there is any

11   guarantee that the defendant will appear but whether the

12   Court can be reasonably assured that he will appear.  In

13   other words, can the Court be reasonably assured that the

14   defendant would adhere to the conditions placed on him by

15   the Court, including the potential for electronic

16   monitoring?

17        The defendant has pointed first to this individual

18   JM in Virginia Beach as a third-party custodian, and I'm

19   going to find immediately that JM is not an appropriate

20   third-party custodian based on the representations by the

21   government about his efforts to not only lie to the police

22   officer the night before the defendant's arrest but to aid

23   and abet the defendant's hideout to law enforcement.

24        With respect to the defendant's ex-wife, the Court

25   has no information about this person other than she lives in

1   Ventura, California, and that together with the defendant
2   they share a 4-year-old child.  This person has not been
3   interviewed or vetted by probation, and so the Court simply
4   cannot consider whether or not the defendant's ex-wife would
5   be a suitable third-party custodian.
6           So as I look at the available conditions available
7   to the Court, I, frankly, am at a loss as to what conditions
8   I could impose that would assure this defendant's appearance
9   based on so many of the comments and announcements he's made
10  to the public at large and based on his conduct both on the
11  day of January 6th and on the days thereafter.
12          The government's burden is to prove the defendant
13  is a risk of flight by a preponderance of the evidence, and
14  I'm going to find the government has established that.  The
15  government's burden is to prove that the defendant is a risk
16  of danger to the community by a preponderance -- excuse me,
17  by clear and convincing evidence, and I'm going to find that
18  the government has established that as well.
19          This is an unusual case presenting unusual facts
20  for the Court to consider, but weighing all of the evidence
21  and argument that has been made here this afternoon, I'm
22  going to find that there are no conditions or combination of
23  conditions that I can impose that will assure the
24  defendant's appearance, will reasonably assure that
25  appearance, and reasonably protect any other person or the

1    community.  So I'm going to issue a written order of

2    detention.

3         Now, Mr. Bosse, does the defendant have a schedule

4    in the court in the District of Columbia?

5         MR. BOSSE:  I don't believe he has an appearance

6    date scheduled yet.  I'm checking right now with the

7    attorney on the case, but I believe the answer is no.  I'll

8    correct that if I find out.  Here it is.  Not until he is

9    transported.  By the time that he is transported and makes

10   his initial appearance there, the ensuing dates will be set

11   out.

12        THE COURT:  All right.  Then, I will go ahead and

13   sign a commitment order transferring the defendant to the

14   District of Columbia, and his next court appearance will be

15   scheduled once he arrives there.

16        All right.  Mr. Bosse or Mr. Cejas, is there

17   anything further for the Court to address regarding this

18   case?

19        THE DEFENDANT:  May I speak to Mr. Cejas?

20        MR. CEJAS:  Yeah.  If we can have a breakout room,

21   Judge.

22        THE COURT:  Certainly.  Lisa, if you would place

23   Mr. Cejas and Mr. Gonzalez in a breakout room so that they

24   can discuss matters privately, I'd appreciate it.

25        All right.  If that's all, thank you, counsel.

1          Thank you, Mr. Gonzalez.  The Court will stand in
2    recess.
3          THE DEFENDANT:  Thank you, Your Honor.
4          (Hearing adjourned at 3:01 p.m.)
5                          CERTIFICATION
6
7          I certify that the foregoing is a correct
8    transcript, to the best of my ability, of the court's audio
9    recording of proceedings in the above-entitled matter.
10
11          X_____/s/_____x
12                     Jody A. Stewart
13               X_____2-23-2021 _____x
14                          Date
15
16
17
18
19
20
21
22
23
24
25

JODY A. STEWART, Official Court Reporter