**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00115 (CRC)** |
| **v.** | : | |
| | : | |
| **EDUARDO NICOLAS** | : | |
| **ALVEAR GONZALEZ,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.[1] For the reasons set forth herein, the government requests that this Court sentence Eduardo Nicolas Alvear Gonzalez to three months' incarceration, $500 in restitution, and a fine in an amount of the Court's discretion.

**I.      Introduction**

Since 2020, Defendant Eduardo Nicolas Gonzalez has been a self-employed social media influencer and sole owner and operator of a media business, Good Lion TV. The defendant broadcasts his views on his website, goodlion.tv, social media, YouTube, and television news.[2] Gonzalez was among the first wave of rioters to enter the United States Capitol during the January 6, 2021 attack—a violent attack that forced an interruption of the certification of the 2020 Electoral

---

[1] The Government attempted to file a CD containing Exhibits 1 and 2 to this memorandum on December 29, 2021, but were notified that the Court is unable to accept physical media until January 4, 2021, when staff returns to the Court. The Government has provided defense counsel with Exhibits 1 and 2 and will provide them to the Court on January 4, 2021.

[2] Because many of the defendant's social media accounts appear to have been suspended, after which he appears to have created new social media accounts, it is difficult to ascertain exactly how many followers he has. However, one of the defendant's Telegram accounts alone has thousands of followers.

College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage. Gonzalez has since engaged in a social media campaign that mischaracterizes and glorifies the events of January 6, 2021, which he has used to benefit and promote himself and his business.

On September 30, 2021, Gonzalez pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a substantial jail sentence is appropriate in this case because Gonzalez (1) was among the first wave of rioters to enter the U.S. Capitol despite seeing violence between rioters and officers; (2) made numerous recordings from the riot and the Capitol; (3) illegally smoked and distributed marijuana to others in the Capitol; (4) only left the Capitol when forced to do so by law enforcement; (5) livestreamed a review of his footage from the January 6 attack on the Capitol in the days following the riot, including noting that he and others were looking for doors to break in; (6) hid from law enforcement after the January 6 attack; and (7) publicly and repeatedly communicated a lack of remorse in his own livestreams, on multiple public platforms, and in an interview aired as part of an HBO documentary—including blaming "infiltration" by "Antifa" and the "FBI."

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety

of numbers.") (statement of Judge Chutkan). Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification combined with the defendant's lack of remorse—illustrated by his post-arrest statements celebrating and endorsing the attack on the Capitol that have continued even after his guilty plea—renders a significant jail sentence both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 29 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Gonzalez's Role in the January 6, 2021 Attack on the Capitol

Gonzalez traveled to Washington, D.C., from his home near Los Angeles, California to attend rallies related to the 2020 Presidential election. He rented an Airbnb in Alexandria, Virginia for the entire month of January and intended to travel home on February 1, 2021.

On January 6, 2021, Gonzalez attended the rally organized by President Trump near the White House. After attending the former President's rally, Gonzalez made his way with the crowd to the Capitol. He wore a sunhat, olive green shirt, and American flag pants. Throughout the day, he recorded numerous videos and photos of the riot. He later said that he had intended to "go live" on January 6, 2021, and broadcast his footage, but was prevented from doing so because his cell phone lost service.

At around 2:30 p.m., Gonzalez climbed from the West Front of the Capitol up to the Upper West Terrace while yelling "we're charging the Capitol!" At approximately 2:36 p.m., he entered the Capitol, undeterred by the presence of multiple law enforcement officers attempting to stop his fellow rioters, including officers who successfully prevented individuals directly in front of him from entering the Capitol. There is no doubt that Gonzalez knew he was not authorized to enter the Capitol. The below image is a still taken from one of his recordings of his approach and entrance. Gonzalez is not pictured in the image, because his camera is facing directly in front of him, but it is clear that Gonzalez was mere feet behind a law enforcement officer stopping another rioter from entering the Capitol.



After entering the Capitol, Gonzalez went up a stairway that led directly to the Rotunda. At 2:44 p.m., Gonzalez left the Rotunda to enter Statuary Hall, before returning to the Rotunda a few minutes later. There, Gonzalez proceeded to smoke a pipe filled with marijuana before later smoking a joint. He then took out multiple marijuana joints he was carrying in his fanny pack and

distributed them to other rioters in the Rotunda. When another person unlawfully present in the Capitol asked why he was smoking weed in the Capitol, Gonzalez replied, "freedom." Below is a photograph that captures Gonzalez smoking marijuana in the Rotunda, surrounded by other rioters.



Soon after 3:00 p.m., Gonzalez exited the Rotunda into the East Rotunda Door interior, close to an exit to the Capitol. Rather than exit the building as so many law enforcement officers ordered, Gonzalez attempted to turn back and return to the Rotunda. A United States Capitol Police officer, however, was forced to grab Gonzalez's backpack and force him to exit the Capitol at 3:07 p.m., as depicted in the below screenshot from Capitol surveillance.



In total, Gonzalez spent approximately 30 minutes inside of the Capitol building. He has admitted that he knew at the time he entered that he did not have permission to do so, and he paraded, demonstrated, or picketed while inside.

*Social Media Statements*

Gonzalez is a self-employed influencer and media producer who broadcasts videos across multiple public and private platforms to thousands of followers and likely more viewers. After the attack on the Capitol, he publicized the attack and promoted the idea that the rioters were "patriots." And he did so using his own photographs and videos he recorded while committing the crime to which he has pled guilty. On January 7, 2021, for example, Gonzalez narrated a livestream video to his online followers on Zoom and later YouTube, walking through many of the photographs and videos he took inside and around the Capitol and describing everything he did on January 6, 2021. *See* Exhibit 1.

During this livestream, Gonzalez showed a video of himself approaching the Capitol from the West side and breaking in with other rioters. According to Gonzalez, "cops were like 'fuck, man, we shouldn't have backed up.'" He then sarcastically stated, "oh but they let us in, right?"

While playing a video of him entering the Capitol building, he made it clear to his followers what he and others were doing, stating, "we're taking our county back." Gonzalez then explained in his livestream that the mob told the officers "they were doing the right thing" by standing down, because they were significantly outnumbered. When the video then panned to four law enforcement officers standing as close as ten feet from the throngs of rioters, Gonzalez narrated, "yeah, you think they're going to actually try to like … shit … they were probably told 'stand down, do not fuck with them, you guys will get hurt.'" On the video, Gonzalez then entered the Capitol and headed straight into the Rotunda. Below is a screenshot of Gonzalez's video narration, showing how close Gonzalez had passed by the outnumbered officers he mocked.



In the same livestream, Gonzalez showed a portion of his January 6 recordings where he continued to march through the Capitol, and he sarcastically said, "yeah, this is the most protected building," and laughed. He then narrated that he and other rioters were looking for "doors to break in" as the video showed him and others exiting the Rotunda and entering various hallways. Gonzalez then played a clip from his recordings where he panned the camera to himself in the

Rotunda and yelled, "time to smoke weed in here!" Gonzalez explained that he asked someone to film him smoking in the Capitol, and the video showed Gonzalez hand the camera to another rioter who recorded Gonzalez lighting a pipe and smoking. A screen shot of the video is below.



Gonzalez described in his livestream how he smoked more joints in the Capitol Rotunda after smoking from the pipe. Specifically, he explained that he smoked three joints at the Trump rally and then discovered that he had an additional eight joints that "were already rolled" on his person while at the Capitol Rotunda. He said he smoked a joint and handed out others to fellow rioters throughout the Capitol Rotunda. To highlight this fact, Gonzalez showed a video of the Capitol Rotunda that appears to be hazy and says, "here it is, me blazing up at the Capitol. Mary jane."

Gonzalez restated to his live viewers "I'm showing everyone how I barged into the Capitol yesterday." Soon afterward, he noted there were "200 plus" people in an open chat room of individuals that appeared to be watching his video live. He explained that he and other rioters were

"the first wave that got in on top." Later, Gonzalez told his followers to "never back down," while showing his videos of him and other rioters storming around the Capitol Rotunda.

Near the end of his livestream, Gonzalez showed another video he filmed outside the Capitol showing a crowd of rioters in what appears to be a standoff with law enforcement, and he stated "these are all American patriots."

*Gonzalez Goes Into Hiding*

Gonzalez was scheduled to fly back to Los Angeles, California, on February 1, 2021.  But during the weekend of January 30, 2021, Gonzalez cancelled his trip. Between January 6 and January 30, numerous arrests related to the events at the Capitol were widely publicized, including, in one case, how law enforcement identified and arrested another rioter defendant at the airport as he waited to board his flight.[3]

Gonzalez instead traveled to Virginia Beach, Virginia to stay with a friend. His cell phone account was shut down, making it impossible to trace him using his phone. Although Gonzalez continued to livestream on YouTube, he concealed where he was staying. In one livestream, for example, he asked his friend and new roommate to remove a shirt with identifying information to further avoid detection. Despite these attempts to conceal his location, law enforcement soon located him. On February 8, 2021, a uniformed officer approached the apartment unit as part of a ruse, and, when the officer knocked on the door, he heard whispering inside. Gonzalez's friend answered the door and told the officer that he was the only person there.

Later that night, Gonzalez livestreamed another video with another individual that "joined" from another location. At one point, Gonzalez and the other individual engage in the following

---

[3]  *See*  https://www.cnn.com/2021/01/25/politics/capitol-hill-rioter-kicked-off-plane-trnd/index.html (Last accessed on December 14, 2021).

exchange about Gonzalez hiding from the cops that day and having an additional location—a "bolthole," or an "escape route"—he could use to escape arrest and avoid punishment:

| | |
|---|---|
| Gonzalez: | Fucking cop comes over this morning, like you see why I fucking hid in the closet praying to God… it was so scary bro … you know I do have an escape route by the way.  I have a lit one … there's a there's a lioness who lives here, up the street … |
| Other Individual: | You've got a bolthole. |
| Gonzalez: | I've got a bolthole, dude, that's tight. |
| Other Individual: | What it means is somewhere to dash to … |
| Gonzalez: | Exactly. It's like bugging out, bug out. |
| Other Individual: | Always good to have a plan B |
| Gonzalez: | Yeah. Yeah. It's Always good and I'm so happy that she reached out and said that cuz now I feel a little like, whew, I could actually probably do something in case that were real. … Well hey we're here now and we're alive and safe, I think the whole riot is gonna be safe, like, we'll be good. Absolutely….I'm out of weed. |

Law enforcement arrested Gonzalez on February 9, 2021.

*Gonzalez Continues to Support the Attack on the Capitol*

After Gonzalez's arrest and eventual release, he repeatedly took to social media to deny his criminal wrongdoing, support the attack on the Capitol on January 6, and spread misinformation. He has left a trail of relevant statements from January 7, 2021, to this month.

On May 24, 2021, after the government filed an unopposed motion to continue a status hearing and toll time in accordance with the Speedy Trial Act, Gonzalez took to another livestream to claim his innocence and blame the government for rigging the election—the same reason he broke into the Capitol two months prior to "steal" his country back:

> I was supposed to go to Court today, but I didn't. Not because I didn't want to. But because, it was postponed. Court was postponed, because our motion to get a speedy trial happenin' was denied. So there is no speedy trial, which means that the offense … they have more time to accumulate evidence. Yeah, what evidence? You fucks. There is no evidence. The evidence will come out against you guys. Because you all rigged the election.

*See* https://youtu.be/rlD_BjVDw7k.

On September 30, 2021, the defendant pleaded guilty. Since then, he has continued to express support for what happened on January 6. Gonzalez appeared in the documentary "Four Hours at the Capitol," for example, which first aired on HBO on October 20, 2021. *See* Exhibit 2. During his interview for the documentary, which also showed portions of his videos from January 6, 2021, Gonzalez mischaracterized the events of the day and demonstrated a total lack of remorse.

In discussing the attack on the Capitol generally, Gonzalez said that "everyone was loving it there . . . it was beautiful actually, and that's the spirit that took the patriots at the Capitol that day. It was us being pissed because we knew what happened." *Id.* at 17:20. Gonzalez explained that he was recording the whole time, and while a video he took from the Upper West Terrace looking out towards the Mall played, he stated, "it was an amazing view to see so many people." *Id.* at 38:20.

Gonzalez said that inside the Rotunda was "quite an interesting vibe," and that the "people were cheerful." *Id.* at 40:00. At around 3:05 p.m., however, when Gonzalez was still in the Rotunda, multiple rioters had already physically engaged with law enforcement officers—clad in riot gear—who were already attempting to physically remove rioters from the Rotunda. In fact, before exiting the Rotunda, Gonzalez walked the perimeter of law enforcement officers while appearing to record them with his phone.

He further explained on the HBO documentary his decision to smoke marijuana in the Capitol: "I think it was a great idea there were so many people were amped up on energy a contact

high would calm them down, and it may have, seven joints under the Rotunda could have prevented some serious shit"—raising the question why "cheerful" people would have engaged in such "serious shit." *Id.* at 41:18. Ultimately, according to Gonzalez, it was not the law enforcement officers or the violence that convinced him to leave; he only left when "Trump told us to go, I remember thinking alright let's get out of here." *Id.* at 1:18:36.

On November 24, 2021, Gonzalez appeared in the media referring to those who attacked the Capitol as "patriots." *There Are Still So Many January 6th Political Prisoners Still In Jail All These Months Later. - Real America's Voice News (americasvoice.news)*, available at https://americasvoice.news/video/qhVcLRqgs3jJgYX/. In that interview, he displaced responsibility for his and other rioters' actions on January 6 onto "Antifa" members and "FBI," stating, "because we do know there was a lot of infiltration, not even from Antifa, but from FBI in this entire situation, FBI." *Id*.

As recently as December 5, 2021, he refers to himself in one social media post as the "Doobie Smoker," includes a photograph of him smoking weed in the Capitol Rotunda, and says he "represented us" on HBO. A screenshot of his post to nearly 5,400 subscribers and more viewers is below:



Finally, the defendant continues capitalize on his crimes to support his business. Gonzalez is self-employed, and he charges subscribers for access to videos on his website, "Good Lion TV." On his website, he promotes himself using an online nickname given to him in the wake of the attack on the Capitol – "Brotunda" – and a caricature of the screenshot above of a now widely-circulated image of him smoking marijuana in the Rotunda with a hazy background.



His current Twitter account for Good Lion TV also uses the handle @brotundalives.



*The Charges and Plea Agreement*

On February 11, 2021, Gonzalez was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2). On February 9, 2021, he was arrested in Virginia. On November 8, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. By plea agreement, Gonzalez agreed to pay $500 in restitution to the Department of the Treasury.

## III.    Statutory Penalties

Gonzalez now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. Gonzalez must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Gonzalez is no exception. While looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

*Entering the Capitol.* Gonzalez did not participate in any violence, but he witnessed conflicts with law enforcement, and it did not deter him from entering the Capitol. To the contrary, the Court can take the defendant at his word from his January 7 livestream video: the officers were outnumbered and "were doing the right thing" by standing down, because they were "probably told 'stand down, do not fuck with them, you guys will get hurt.'" He saw the threat of violence from such a large mob against outnumbered officers and understood that it was a major tool that enabled the rioters to gain entry to the Capitol. Indeed, law enforcement was stopping other rioters mere feet away from him from entering the Capitol, and yet he proceeded to go past the officers and "charge the Capitol" in part to "take [his] country back."

*Actions inside.* By his own admission, Gonzalez was among the first wave of people to breach the Capitol. He was not unwillingly propelled into the Capitol from pressure from the crowd, but by his own volition. And, while inside, he was not merely an observer of events around him. He illegally smoked marijuana in one of the most hallowed locations in American democracy and encouraged others to do the same, casting a haze of smoke across the Rotunda, its paintings, and the officers attempting to remove the rioters.[4] His use and distribution of marijuana in the Capitol Rotunda was not only an intrusion and violation of a revered and sanctified space, but also

---

[4] Damage done to the artwork in the Capitol cannot be directly attributed to the defendant, but it is worth noting that the rioters caused extensive damage to artwork in the Capitol. *See* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf.

contributed to the difficulties law enforcement faced in removing people from the building that day. His use of marijuana in the Capitol, and his continued self-promotion of himself as "Brotunda" underscores his cavalier attitude toward the violence and destruction that was happening around him on January 6, 2021.

*Forced to Exit.* When Gonzalez eventually left the Capitol, he did not go willingly, despite his later statement that he left when former President Trump told the rioters to leave. When he had exited the Rotunda and was near an exit point from the Capitol itself, the defendant in fact attempted to turn around and go back into the Rotunda. He was stopped by a police officer from returning to the heart of the Capitol and, even at that point, he was unwilling to obey directions from law enforcement, leaning backward and continuing to record his surroundings with his phone.

*Hid from law enforcement.* Gonzalez attempted to evade detection and hide from the police after the attack on the Capitol. He changed his travel plans, let his phone plan expire, and hid in a closet when the police came to the apartment where he was staying. He allowed his friend to lie to law enforcement on his behalf so he could remain hidden, and he discussed online his "backup" plan of running to another supporter's location in case he was caught. This further represents a lack of respect for the law and need for incarceration.

*No remorse.* Gonzalez has made relevant statements in the public about his actions and January 6 from the day after his crimes to just this month, giving the court real-time insight into the defendant's lack of remorse up to sentencing. Gonzalez's statements online and in the media during and after the attack demonstrate not only a lack of remorse, but also an eagerness to use the riots – in which hundreds of officers were injured and multiple people were killed – to promote himself and his business.

Gonzalez filmed numerous livestreamed videos on multiple platforms, sometimes with other vloggers, discussing the attack on the Capitol and his own role. He used his subsequent participation in the HBO documentary "Four Hours at the Capitol," in which he described the riots as "beautiful" to spread misinformation. He has demonstrated time and again this lack of remorse and eagerness to publicize and promote his crimes, while simultaneously mischaracterizing the nature of the events of January 6, 2021. This places him on the spectrum of individuals whose conduct is more serious than the average misdemeanant.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Gonzalez's criminal history consists only of several traffic infractions. PSR ¶¶ 32-35. Gonzalez advised the PSR writer that he has been self-employed as the sole operator and owner of Good Lion TV since 2020. In short, Gonzalez is in the business of making and promoting his own media. Since January 6, 2021, a significant amount of his output has been related to the attack on the Capitol, including promoting his own videos he recorded while participating in the riot. Gonzalez, of course, is free to voice his opinion, but when doing so reflects a complete lack of remorse for his actions on January 6 and the potential for recidivating, his conduct weighs in favor of a sentence of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process."[5] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including in misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected.") (statement of Chief Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *see also United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss); *see also United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan). It is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Gonzalez's words and statements in the media clearly demonstrate the need for specific deterrence for this defendant. Gonzalez celebrated the attack on the Capitol by sharing his footage

from the riots and providing additional commentary by making the video in Exhibit 1. Many months later, Gonzalez continued to defend the attack on the Capitol, claiming that it was "beautiful." And he continues to try to make money off of those actions, incentivizing him all the more to view his criminal actions favorably.

As of the date of this filing, Gonzalez has not expressed remorse. The government acknowledges that he accepted responsibility by entering into this plea agreement. But that is hardly sufficient on its own to convince the Court that he has learned any lesson. The Court need look no further than Gonzalez's ongoing statements and false propaganda online to see that he continues to support what happened on January 6. Gonzalez has inextricably tied himself, his social media persona, and his business to his crimes on January 6, 2021. His lack of remorse and potential to recidivate underscore the need for specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[6] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum,

---

[6] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[7]

Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Four of the Superseding Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C.

---

[7] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

§ 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences.").

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed on Derek Jancart and Jenna Ryan for reference.

Jenna Ryan, another Capitol Riot defendant who pleaded guilty to a misdemeanor, received a sentence of 60 days' incarceration. Ryan, a self-described "influencer" promoted the events of January 6, 2021 on social media, livestreaming prior to and during the riots, and similarly using the events as a means of self-promotion. However, Ryan was not in the first wave of rioters to enter the Capitol; she entered at 3:21 p.m. and stayed inside the Capitol for only a few minutes. Accordingly, while her promotion of the attack on the Capitol, like Gonzalez's, is very serious, her entry and time in the Capitol is less significant than Gonzalez's own conduct as part of the "first wave" who stormed the Capitol.[8]

Derek Jancart similarly pleaded guilty to a Class B misdemeanor for his participation in the January 6, 2021 attack on the Capitol and received a sentence of 45 days' incarceration. Jancart posted a video to Facebook during the January 6, 2021 attack of his codefendant making threatening statements to the police. Jancart was also in the first wave of individuals who entered the Capitol and failed to demonstrate any remorse. However, Jancart was one of the earliest Capitol Riots defendants to plead guilty, which likely induced others to plead guilty, which is a significant mitigating factor that does not apply here.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

---

[8] Neither Jancart or Ryan took drugs into the United States Capitol and consumed and distributed them.

own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Gonzalez to three months' incarceration, $500 in restitution, and a fine. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    */s/* Anne Veldhuis
ANNE VELDHUIS
Trial Attorney
Detailee
CA Bar No. 298491
450 Golden Gate Ave., Room 10-0101
San Francisco, CA 94102
(415) 934-5300
anne.veldhuis@usdoj.gov

Troy A. Edwards, Jr.
Assistant United States Attorney
N.Y. Bar 5453741
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7081
Troy.Edwards@usdoj.gov